**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MAK MEDICAL, LLC, on behalf of itself and all others similarly situated, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | JURY TRIAL DEMANDED |
| CSL LIMITED, CSL BEHRING LLC, and BAXTER INTERNATIONAL INC., ) ) ) | |
| Defendants. ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff MAK Medical ("Plaintiff"), individually and on behalf of a class action of all direct purchasers similarly situated, brings this action for treble damages, injunctive relief and costs of this suit under the antitrust laws of the United States against CSL Limited, CSL Behring LLC and Baxter International, Inc. ("Defendants"), and alleges as follows based upon personal knowledge, the investigation of its counsel, information and belief, and publicly-available information:

## INTRODUCTION

1.      This case arises out of an alleged conspiracy by Defendants and unnamed co-conspirators to restrict output and to fix, raise, maintain and/or stabilize the prices for immuneglobulin ("Ig") and albumin, protein derived from blood plasma (collectively, "Blood Plasma Proteins").

2.      Blood Plasma Proteins are medically necessary products used primarily by hospitals to treat critically ill patients suffering from hemophilia, kidney disease, immune

disorders and other chronic and acute medical conditions. Because Blood Plasma Proteins have no suitable substitutes, hospitals, physicians, clinicians, specialty pharmacies and other purchasers are willing to pay very high prices to ensure proper treatment of critically ill patients.

3.     The Blood Plasma Proteins industry is a multi-billion dollar industry which has undergone substantial consolidation and considerable price increases since the 1990s. It was recently revealed in a suit filed by the Federal Trade Commission ("FTC") to prevent the merger of two Blood Plasma Proteins producers that the consolidation has resulted in an industry that operates as a tight oligopoly, in which the remaining Blood Plasma Proteins participants have a high level of information sharing and interdependence among firms. Through this information sharing, Defendants have recognized and agreed that they are better off avoiding competition, restricting supply and raising prices. They are keenly aware that these practices are profitable only if all firms cooperate and therefore monitor and enforce their agreement.

4.     The FTC has concluded that the highly concentrated Blood Plasma Proteins markets are "exhibiting troubling signs of coordinated behavior." In support of this conclusion, the FTC found that Blood Plasma Proteins producers signal each other with key words to:

- Suggest to each other that increasing the production of those drugs could hurt the firms' ability to reap the significant profits they all achieved during the extended period where demand exceeded supply for the key products;

- Remind each other of how, during a period when supply increased, prices and profitability for the firms in the market dropped significantly, and

- Encourage each other to only increase supply incrementally to keep pace with demand, not increase supply to the extent the firms actually compete with each other for market share.

5.     Similar language has been found to be evidence supporting an illegal price fixing conspiracy.  *See, e.g. In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 662 (7th Cir. 2002) (Posner, J.) (referring to competitor as a "friendly competitor," mentioning an "understanding between the companies that … causes [them] not to … make irrational decision," and querying whether competitors will "play by the rules "(discipline)" can all be evidence of an explicit agreement to fix prices."

6.     Plaintiff brings this case on behalf of a class of direct purchasers of Blood Plasma Proteins as defined below, to recover for the injuries incurred by paying artificially inflated prices.  Defendants' alleged conspiracy to restrict output and to fix, raise, maintain and/or stabilize the prices for Blood Plasma Proteins caused purchasers of Blood Plasma Proteins to pay artificially inflated prices, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, from at least October 1, 2004 until the present (the "Class Period").

## JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction under 28 U.S.C. §1331 and 1337, as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26.

8.     The Court also has diversity over this matter pursuant to 28 U.S.C. § 1332 (d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000.00 exclusive of interest and costs, and in which some members of the proposed class are citizens of a state difference from some Defendants.

9. Venue is proper in this District because Defendants reside, are found, have agents, and transact business in this District or provided in 28 U.S.C. § 1391 (b) and (c), and in Section 4 and 12 of the Clayton Act. 15 U.S.C. §§ 15(a) and 22. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District.

10. The Court has personal jurisdiction over Defendants because they transact business in this District and throughout the United States. They sold Blood Plasma Proteins in this District and throughout the United States, and they engaged in a fraudulent scheme and conspiracy to restrict output and fix prices that was directed at and had the intended effect of causing injury to persons and entities residing or located in or doing business in this District and throughout the United States.

## PARTIES

11. Plaintiff is a corporation organized under the laws of the state of Georgia with its principal place of business located in Camilla, Georgia. During the Class period, Plaintiff purchased Blood Plasma Proteins directly from one or more of the Defendants. The prices that Plaintiff paid to Defendants or their co-conspirators for Blood Plasma Proteins were, as a result of the conspiracy herein alleged, higher than they otherwise would have been. As a result of the alleged conspiracy, Plaintiff was injured in its business and property by reason of the antitrust violations alleged herein.

12. Defendant Baxter International Inc. is a global, diversified healthcare company that incorporated in Delaware and has its principal place of business at One Baxter Parkway, Deerfield, Illinois 60015. Baxter is the largest producer of plasma-derivative protein therapies in the world, and in the United States. Baxter is divided into three business segments: BioScience;

Medication Delivery; and Renal. The BioScience business manufacturers and sells, among other products, recombinant and plasma-based proteins to treat deficiencies, alpha 1-antritrypsin deficiency, burns and shock, and other chronic and acute blood-related conditions. Baxter maintains 15 manufacturing facilities in the United States and its territories, as well as facilities in 23 other countries. Its BioScience division has 11 manufacturing sites domestically and abroad, including sites in Hayward, Thousand Oaks, and Los Angeles, California and in Beltsville, Maryland. In 2008, Baxter's revenues exceeded $12.3 billion, and it derives about 20% of its sales from plasma products.

13.     Defendant CSL Limited is a company incorporated and domiciled in Australia with its principal place of business located at 45 Popular Road, Parkville, Victoria, 3052, Australia. CSL Limited is the second-largest supplier of plasma-derivative protein therapies in the world. It produces and sells biotherapies indicated for the treatment of several rare primary immune deficiency diseases, coagulation disorders, and inherited respiratory disease. CSL Limited is a vertically integrated company. It also owns and operates one of the world's largest plasma collection networks, CSL Plasma, with collection facilities and laboratories in Boca Raton, Florida and Marburg, Germany. It also owns and operation manufacturing sites, through its wholly-owned subsidiaries, in Marbury, Germany and Bern Switzerland. CSL Limited's worldwide sales for its 2008 fiscal year were about $2.4 billion.

14.     Defendant CSL Behring LLC is a wholly-owned U.S. subsidiary of CSL Limited and is headquartered at 1020 First Avenue, King of Prussia, Pennsylvania 19406-0901. CSL Behring is the second-largest producer of plasma products in the United States. CSL Behring's products are indicated for the treatment of coagulation disorders including hemophilia and von Willebrand disease, primary immune deficiencies, and inherited respiratory diseases. Its

products also are used in cardiac surgery, organ transplantation, and burn treatment, and for the prevention of hemolytic diseases in newborns. CSL Behring has manufacturing site in Kankakee, Illinois. CSL Behring's sales revenue was approximately $1.8 billion for its 2008 fiscal year.

15.     CSL Limited and CSL Behring LLC are referred to herein collectively as "CSL."

## CO-CONSPIRATORS

16.     Various other individuals, firms and corporations, not named as Defendants herein, may have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Plaintiff reserves the right to name subsequently some or all of these persons as defendants.

17.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or though its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## INTERSTATE TRADE AND COMMERCE

18.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.

19.     During the time period covered by this Complaint, Defendants and their coconspirators marketed and sold Blood Plasma Proteins continuously in interstate commerce to customers located throughout the United States.

20.     Defendants and their co-conspirators, and each of them, have used instrumentalities of interstate commerce to market and sell Blood Plasma Proteins to customers located throughout the United States.

21.     The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonable foreseeable effect on interstate commerce.

## RELEVANT MARKET

22.     The relevant geographic market is the United States.

23.     The relevant product markets are the market for Ig and the market for albumin. These markets are referred to collectively herein as the Blood Plasma Proteins markets.

## FACTUAL ALLEGATIONS

## THE BLOOD PLASMA PROTEINS INDUSTRY

24.     Blood plasma therapies are unique among pharmaceuticals and biologics because their production begins with human plasma, instead of a chemical of synthetic, which is the starting material for a majority of pharmaceuticals.

25.     Human plasma contains a number of proteins, including albumin, clotting factors, immunoglobins and alpha-l proteinase inhibitors. These proteins are utilized to make therapies that treat rare, chronic, often genetic diseases, such as hemophilia, primary immunodeficiencies and alpha-l antitrypsin deficiency, and acute conditions such as burns and shock.

26.     The ability to produce high-quality blood plasma-derivative therapies depends on the willingness of people to donate plasma. In the United States, plasma can be donated at 380 donation sites licensed by the Food and Drug Administration ("FDA").

27.     The process of donating blood plasma is a long and tedious one. The first donation can take up to three hours of a donor's time, and involves a series of screenings, donor

education, and the actual donation process itself. After the first donation, subsequent donations can take up to two hours.

28.     The manufacturing process of plasma-derivative therapies is done through a process called fractionation. The process is unique to blood plasma-derived therapies. In this process, the plasma is collected, purified, and processed to extract specific plasma proteins. Therapeutic proteins are then extracted from a plasma production pool of multiple donations in a specific order. These proteins are separated using a linked series of steps with varying conditions of temperature, pH, and ethanol concentration, among others. The number of proteins that are extracted from this pool is known as the yield. Due to the complexity of the fractionation process, the time between donation and final product release can take anywhere between seven and nine months.

29.     The manufacturing process is highly regulated because plasma products run the risk of containing and transmitting infections. Regulatory bodies overseeing this industry include in the United States FDA, state regulatory agencies, and the Plasma Protein Therapeutics Association ("PPTA"), an industry self-regulatory body.

30.     Plasma-derivative proteins are essential for treating a number of serious illnesses, including immune deficiency diseases, coagulation disorders, and respiratory diseases. The annual cost for such treatments can exceed $90,000 per patient in some cases.

31.     The most prominent plasma-derivative proteins are: (I) Ig; (2) albumin; (3) Alpha-1; and (4) Rho-D. The plasma-derivative protein products at issue in this Complaint are Ig and albumin and are referred to collectively as Blood Plasma Proteins.

32.     Ig is a widely used drug than can be administered intravenously ("IVIG" or "IGIV") or subcutaneously ("SCIG"). IVIG, the more predominant form has over 20 FDA-

approved indications, and as many as 150 off-label uses. Ig products are antibody-rich plasma therapies that long have been used in the treatment of primary immune deficiencies (to provide antibodies a patient is unable to make) and certain autoimmune disorders where it is believed to act as an immune modulator. In addition, physicians frequently prescribe Ig for a wide variety of diseases, although these uses are not described in the product's labeling and differ from those tested in clinical studies and approved by the FDA or other regulatory agencies in other countries. These unapproved, or "off-label," uses constitute the preferred standard of care or treatment of last resort for many patients in varied circumstances by physicians.

33.     Ig represents the largest plasma-derived protein product by value. It is estimated that 70% of IVIG sold in the United States in 2007 was purchased by hospitals through contracts negotiated with GPOs. Physician offices represented about 13% of IGIV volume, and homecare companies and specialty pharmacies represented about 17% of IGIV volume.

34.     Albumin is the most abundant protein in human plasma. It is synthesized by the liver and performs multiple functions, including the transport of many small molecules in the blood and the binding of toxins and heavy metals, which prevent damage that they otherwise might cause. Albumin is used as a blood volume expander and to prime heart values during some types of cardiac surgery. It is generally is used in surgical and trauma settings and typically is sold to hospitals.

35.     The Blood Plasma Proteins products industry is valued at $14 billion globally. The United States accounts for approximately 70% of the world's supply of plasma. In terms of demand, North America accounts for 40% of the product market, with Europe constituting 32% and Asia 19%.

36. Baxter and CSL and are the world's leading plasma-derived products producers. Combined, they have about 60% of both the Ig and albumin markets.

37. In 2006, the U.S. Bureau of Labor Statistics added human blood plasma services to its Producer Price Index ("PPl"). A PPI is a measure of the average change over a given period of time in the selling prices received by domestic producers for their output.

## THE CONSPIRACY

38. In the early 2000s, the blood plasma products industry was burdened with poor fundamental demand, excess capacity and lack of pricing power. As a result, the industry was forced to consolidate and in the process, eliminated substantial capacity.

39. As part of the consolidation producers acquired not just other producers, but also acquired plasma collection centers. This was done in order to achieve greater vertical integration of their businesses, gain greater control of the plasma supply, to ensure the plasma collected met their quality standards, and to reduce their costs. This vertical integration resulted in about 80% of plasma collection centers being owned by plasma-products companies such as Baxter, CSL Limited, Grigols USA ("Grifols"), and Talecris Biotherapeutics Holdings Corporation ("Talecris").

40. For example, in July 2000, CSL Limited acquired the Swiss Red Cross fractionator, ZLB, as well as 47 plasma collection centers from Nabi. In 2003, it acquired Aventis Behring's plasma products business. CSL Limited subsequently closed 35 plasma collection centers in the United States, reduced plasma collections by 1 million liters, and reduced plant output by 1.1 million liters.

41. In late 2000, Baxter had acquired 42 plasma collection centers and a laboratory from Alpha Therapeutic Corporation (Mitsubishi Pharma). Baxter subsequently closed 26 of its

own plasma collection centers and 38 collection centers that it acquired from Alpha Therapeutic, as well as a plant in Rochester, Michigan.

42. By 2003, the number of Blood Plasma Proteins producers had dropped from thirteen to nine. In 2005, a major non-profit entity, the American Red Cross, exited the plasma products industry. Since 2005, there have been only five plasma-derivative protein products producers: CSL, Baxter, Talecris, Grifols, and Octapharma USA, Inc. ("Octapharma"). Additionally, the supply of plasma was reduced by an estimated 28% between 2000 and 2005.

43. As competition and plasma supply was eliminated through consolidation in the plasma-derivative protein products industry, prices increased dramatically.

44. In 2006, the Department of Health and Human Services ("HHS") investigated reports that patients were experiencing problems purchasing Ig. HHS found that a majority of hospitals surveyed could not purchase enough IGIV to meet all of their patient needs, and calculated that the shortfall of supply relative to demand was approximately 14%. At the time, HHS stated that Ig "manufacturers are currently allocating IGIV to their customers. Under this allocation system, most customers are expected to justify their current IGIV use to the manufacturer to maintain and/or increase their allocations. Some pharmacies have been unable to purchase these products in recent years. In economic terms, current IGIV supplies are being "rationed."

45. It now appears that these price increases and supply problems were not the result of a natural market forces, but rather the result of a concerted effort by Defendants to restrict the output of Blood Plasma Proteins in order to increase prices.

46. By the mid-2000s, due to the market changes brought about by consolidation, Defendants had come to recognize that controlling capacity was critical to preventing price

competition. Accordingly, beginning at least as early as October 1, 2004, Defendants implemented an illegal agreement to fix prices for Blood Plasma Proteins by coordinating and restricting output.

47. Defendants have implemented this agreement through signaling - *i.e.*, intentionally sharing competitive information for the purposes of receiving accommodating reactions from competitors. Specifically, Defendants would signal each other with key words to:

- Suggest to each other that increasing the production of these drugs could hurt the firms' ability to reap the significant profits they all achieved during an extended period where demand exceeded supply for the key products;

- Remind each other of how, during a period when supply increased, prices and profitability for the firms in the market dropped significantly; and

- Encourage each other to only increase supply incrementally to keep pace with demand, not increase supply to the extent the firms actually compete with each other for market share.

48. Baxter's CFO acknowledged Defendants' signaling in a recent investor call, stating: "Why any of us would, for a very short-term gain, do anything to change [the current marketplace dynamics], I just don't see why we would. It wouldn't make any sense and from everything we read and all the signals we get, there is nothing that says anyone would do that. I think people are very consistent in the messages they deliver, which are pretty consistent with what we have told you today." Additionally, Baxter has recognized that as long as competitors are not "irrational" and do not "trash price and take share," then they can increase supply steadily in line with market demand to keep prices high.

49. Defendants often signaled publicly about their desire to raise prices. For example, on October 18, 2007, Baxter's CFO and Corporate Vice President, Rob Davis, stated on a Q3 2007 earnings conference call that with respect to Baxter's plasma business, there was going to be "price appreciation," and that Baxter expected to see "low to mid single digit price growth over our long-range horizon."

50. On January 24, 2008, Baxter's CEO, Bob Parkinson, stated on a Q4 2007 earnings conference call that with respect to the plasma business, "it would seem that people [competitors] are doing what they need to do to ensure that the global demand can be met collectively by the industry."

51. Additionally, in a Prospectus Summary, dated July 23, 2008, Talecris stated "We believe that plasma supply constraints will continue to be pervasive in our industry in the near term, impacting our ability to satisfy demand for Gamunex IGIV.... We believe that growth in demand, continued constrained production capacity and increasing production costs are likely to result in higher prices. We anticipate implementing measured price increases for most of our products in the near term."

52. In addition to signaling, Defendants engaged in secretive information sharing. The extent of Defendants' improper information sharing was recently revealed by the FTC, which, in its investigation, discovered that the manufacturers are "collecting and cataloging an extraordinary wealth of timely competitive information, to ensure that all are engaging in desired 'rational' and 'disciplined' behavior." For example, the FTC found that a PowerPoint presentation compiled by Talecris CEO Alberto Martinez that was almost identical to a presentation by CSL chief economist Sam Lovkick, including 32 of 59 slides.

53. Through this information sharing, Defendants have developed sophisticated oligopoly models to estimate and predict changes in supply and demand.

54. CSL explored means of punishing firms that did not comply with the Defendants' agreed-upon output levels, particularly Talecris, that attempted in some instances to increase capacity and output in contravention of the prevailing restrained approach.

55. Defendants' conspiracy has been successful. It has resulted not only in supra-competitive pricing, but also extraordinary profits for Defendants, even as most other industries have experienced drastically lowered earnings in the face of the global economic crisis.

56. A 2006 HHS Report found that average prices for IGIV have been steadily increasing since 2004 and the upward trend was expected to continue through 2007. For example, in 2004 the average price for liquid IGIV was approximately $44 per gram, while for the first half of 2006, the price had risen to almost $48 per gram. By 2009, according to an analyst presentation by Grifols on March 5, 2008, the price for IVIG was projected to reach $57 a gram.

57. The average price of albumin has increased from about $1.25 per gram in 2005 to about $2.20 per gram, according to the same Grifols presentation. The presentation also reports that "average albumin prices have steadily increased since 2005 from U.S. $14 to around U. S. $35 per 12.5 g. vial at present."

58. In 2006, CSL, whose sales of blood plasma products, such as IVIG and albumin generate about 90% of its earnings, had profits of $351 million. For the half-year ended December 31, 2008, CSL reported profits of $502 million.

59. In 2008, Baxter's BioScience unit reported revenues of $1.36 billion, an increase of 12% largely due to sales of blood plasma-based products. Due to the profit its BioScience unit

has generated, one news article has noted that "Baxter is one of a handful of stocks that have proven somewhat resistant to the global recession."

60.     Baxter explained in a recent investor call how competitors have "lived through the events of the early 2000s," referring to the period of excess supply and lower prices, and now have returned to a time of "very good stock prices and very good returns for shareholders."

61.     Similarly, at the 2007 Plasma Protein Forum, held June 5-6 at the Hyatt Regency in Reston, Virginia, and attended by numerous industry executives, including those of Defendants, Peter Turner, PPTA Chairman and President of CSL Behring, "declared the industry to be in 'good shape' after a few bumps in the road in years past."

**FACTORS INCREASING THE MARKETS' SUSCEPTIBILITY TO CONSPIRACY**

62.     The structure and characteristics of the Blood Plasma Proteins markets, such as the concentrated market share held by Defendants, the absence of competitive fringe sellers, the commodity-like nature of Blood Plasma Proteins, the lack of available substitutes, the inelasticity of demand, the high barriers to entry, numerous purchasers of Blood Plasma Proteins, and opportunities for competitor contact and communication all make the Blood Plasma Proteins market susceptible to anticompetitive conduct and make the conspiracy alleged herein plausible.

Concentrated Market Share Held by Defendants

63.     A high degree of market share concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among possible co-conspirators and makes it more difficult for customers to avoid the effects of collusive behavior.

64.     Defendants control a high percentage of the United States plasma-derivative protein industry, collectively possession about a 60% market share. Specifically, Baxter controls about 36% of the market and CSL controls about 24% of the market.  The remaining

15

manufacturers, Talecris, Grifols and Octapharma, possess shares of approximately 23%, 7% and 5% respectively.

65.     With respect to the domestic Ig market, according to 2008 sales volumes, Defendants collectively possess approximately at 62.9% market share. CSL has about a 27.5% market share and Baxter has about a 35.4% market share. The remaining manufactures, Talecris, Grifols and Octapharma, possesses shares of approximately 20.9%, 9% and 7.2% respectively.

66.     The Herfindahl-Hirshchrnan Index ("HHI") is a measure of industry concentration that economists often use to quantify the degree of market concentration. The U.S. Department of Justice ("DOJ") considers an HHI higher than 1,800 to be a highly concentrated market. The Ig market is highly concentrated, with an HHI of 2,579.

67.      With respect to the domestic albumin market, according to 2008 sales volumes, Defendants collectively possess approximately at 73.05% market share. CSL possesses about a 36.61% market share and Baxter maintains about a 36.44% market share. The remaining competitors, Talecris, Grifols, and Octapharma, possess shares of 8.83%, 13.06%, and 5.07%, respectively. The albumin market is highly concentrated, with an HHI of 2,942.

68.     Throughout the Class Period, Defendants collectively possessed market power to raise prices above competitive levels in the Blood Plasma Proteins markets in the United States without losing appreciable market share to non-conspirators.

69.     Additionally, the oligopolistic structure of the market enabled Defendants to share competitive information. It also enabled Defendants to closely monitor each other's activities with respect to plasma collection, manufacturing, and output.

Commodity-Like Nature of Blood Plasma Proteins

70.     A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the good in question and it is easier to effectively monitor those prices.

71.     Blood Plasma Proteins are homogeneous, commodity-like products within each given market (e.g., Ig and albumin) and one Defendant's Blood Plasma Proteins can be substituted for the Blood Plasma Proteins made by the other Defendants. Indeed, the Federal Trade Commission has found that "Within each relevant [Blood Plasma Proteins] market, the product offerings of Defendants are largely homogenous."

72.     Because the Blood Plasma Proteins offered by Defendants are homogenous, commodity-like products, competition is based largely, if not entirely on price.

Lack of Substitutes

73.     The lack of available substitutes for a product also helps facilitate an effective price-fixing conspiracy. In the absence of substitutes, producers of the product in question are able to raise product prices without losing significant sales.

74.     There are no substitutes for either Ig or albumin. As such, purchasers (usually hospitals) of Blood Plasma Proteins will pay very high prices if necessary to make treatment available to their critically ill patients.

Inelastic Demand

75.     Inelastic demand for a product means that price increases do not result in fewer sales.  In order for a cartel to profit from raising prices above competitive levels, demand for the product must be sufficiently inelastic such that any loss in sales will be more than offset by

17

increases in revenue on those sales that are made. Otherwise increased prices would result in declining revenues and profits.

76.     The demand for Blood Plasma Proteins is highly inelastic. Blood Plasma Proteins are medical necessities for a segment of patients. Because they have no substitutes, hospitals and physicians will purchase them at whatever price they are offered by Defendants to treat their patients.

77.     Additionally, small changes in production levels cause dramatic swings in prices for Blood Plasma Proteins and producers stand to increase profits greatly by controlling output relative to demand.

78.     Thus, Blood Plasma Proteins are excellent candidates for cartelization because price increases do not result in fewer sales.

Barriers to Entry

79.     Supra-competitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the significant barriers to entry into the Blood Plasma Proteins market makes it more difficult and helps to facilitate the operation of a cartel.

80.     There are significant barriers to entry which have prevented potential competitors from entering and competing in the Blood Plasma Proteins markets during the Class Period.

81.     Each step of manufacturing process for Blood Plasma Proteins involves substantial up-front, costs, lengthy regulatory approvals process by federal and state agencies, and specialized technical know-how and expertise coupled with the lengthy fractionation and manufacturing process. According to the PPTA, "the development of new plasma-derived therapies is difficult and requires significant investment from manufacturers. Considerable

research efforts and dedicated resources are required in new therapeutic areas to demonstrate clinical efficacy."

82.     In addition, entry into the Blood Plasma Proteins markets requires a significant amount of intellectual property, including patents, copyrights, trademarks, trade secrets, know how relating to purification of products and pathogen safety, and substantial product research and development.

83.     Moreover, each Blood Plasma Protein must be approved for sale in the United States by the FDA. To obtain approval, the products must be produced plasma collected in the United States at collection centers approved by the FDA. The products also must be manufactured at plants approved by the FDA. Such regulatory hurdles impost significant barriers to entry and extend the time it would take to enter the United States markets.

84.     Only a determined and well funded competitor with the specialized knowledge needed to manufacture Blood Plasma Proteins and the capital and patience necessary to meet the FDA's strict licensing requirements can compete in this market. In light of these hurdles to entry, Defendants have not had to face substantial new competition in recent history, from a competitor who had the ability to impact the market.

Numerous Buyers

85.     With thousands of buyers, each of whom forms a small share of the marketplace, there is less incentive for cartel members to cheat on collusive pricing arrangements, since each potential sale is small while the risk of disrupting the collusive pricing agreement carries large penalties.

86.     There are thousands of customers who purchase Blood Plasma Proteins. In its 2005 10-K, Baxter states that its products are used by "hospitals, clinical and medical research

laboratories, blood and plasma collection centers, kidney dialysis centers, rehabilitation centers, nursing homes, doctors' offices and by patients at home under physician supervision." Similarly, CSL Limited states in its 2007 Annual Report that it minimized "the credit risks associated with trade and other debtors by undertaking transactions with a large number of customers in various countries."

Opportunities for Competitor Contact and Communication

87.     In order to be successful, collusive agreements require a level of trust among the conspirators.

88.     Collaboration fostered through industry associations facilitates relationships between individuals who would otherwise be predisposed to vigorously compete with each other. Here, Defendants are members of trade associations and regularly attend meetings together.

89.     For example, Defendants are members of the Plasma Protein Therapeutics Association ("PPTA"). The PPTA is "the primary advocate for the world's leading source plasma collectors and producers of plasma-based and recombinant biological therapeutics."

90.     Defendants are Global, North American, and European Members of the association, and their high-level executives, including Peter Turner, President of CSL Behring, and Larry Guiheen, President of Baxter BioScience, serve on the association's Global Board of Directors. Mr. Turner also serves as the association's president. The PPTA convenes its annual meeting, known as the Plasma Protein Forum, in June in the Washington, D.C. metropolitan area, and high-level executives from Defendants, such as Messrs. Turner and Guiheen, routinely attend.

91.     Such trade association meetings provide the opportunity for participants in price-fixing conspiracies such as this one to meet, have improper discussions under the guise of

legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.

92.     The opportunity to conspire is also enhanced where there are business relationships among competitors. According to Talecris's November 19, 2007, filing with the SEC, it obtained 33% of its plasma from CSL until June 30, 2007.

### FTC INVESTIGATION

93.     The FTC recently investigated the Blood Plasma Proteins market and uncovered evidence suggesting the existence of an illegal price-fixing conspiracy, among the Defendants.

94.     The circumstances surrounding the FTC's investigation involved a potential acquisition of Talecris by CSL. Pursuant to an Agreement and Plan of Merger, dated August 12, 2008 ("Agreement"), CSL proposed to acquire all of the outstanding voting securities of Talecris in a transaction valued at $3.1 billion.

95.     The proposed merger was reviewed for potential anticompetitive effects by the FTC.  After an eight month investigation, which included the collection of testimony and declarations from 21 witnesses, on May 27, 2009, the FTC filed an administrative complaint to block the proposed merger, and on June 2, 2009, filed a complaint in the United States District Court for the District of Columbia seeking a temporary restraining order and preliminary injunction to block the proposed merger. In both complaints (collectively, "FTC Complaints"), the FTC asserted that the proposed merger would violate Section 5 of the Federal Trade Commission Act, as amended, I U.S.C. § 45, by (1) making CSL the world's largest maker of blood plasma products; (2) substantially reducing competition in the U.S. market for Plasma-Derivative Protein Therapies, among other plasma-based products; (3) limiting industry supply

of Plasma-Derivative Protein Therapies, among other plasma-based products; and (4) causing increased prices for Plasma-Derivative Protein Therapies, among other plasma-based products.

96.     The FTC Complaints assert that industry consolidation in recent years emboldened producers to seek to avoid competition, restrict supply and raise prices.

97.     While the FTC Complaints are redacted, in a motion to place the unredacted complaint on the public record, the FTC stated that the redacted language "suggests a strong possibility of ongoing coordinated interaction between firms in the plasma industry."

98.     In the motion, the FTC also states that the redacted language "is similar to language that in other instances has been found to be evidence supporting an illegal price fixing conspiracy," *citing In Re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 662 (7th Cir. 2002) (Posner, 1) (referring to competitor as a "friendly competitor," mentioning an "understanding between the companies that ... causes [them] not to ... make irrational decisions," and querying whether competitors will "play by the rules (discipline)" can all be evidence of an explicit agreement to fix prices).

99.     CSL has opposed the motion. The FTC has responded by stating that the redacted material does not qualify as confidential business information, and that while disclosure of the material could cause "embarrassment" and "could 'expose respondent to possible treble damages actions.'" those reasons are not sufficient to prevent disclosure.

100.    On June 8, 2009, CSL and Talecris announced that they agreed to terminate their merger agreement due to the FTC's opposition. On June 15, 2009, the FTC and CSL filed a joint motion to dismiss the Complaint.

## CLASS ACTION ALLEGATIONS

101.    Plaintiff bring this class action pursuant to Rule 23 of the Federal Rules of Civil

Procedure, as representatives of the following Class (the "Class"):

> All persons and entities in the United States who purchased Blood
> Plasma Proteins directly from any Defendant between and
> including October 1, 2004 and the present. Excluded from the
> Class are Defendants, their parent companies, subsidiaries and
> affiliates, any co-conspirators, federal governmental entities and
> instrumentalities of the federal government, states and their
> subdivisions, agencies and instrumentalities.

102.    Plaintiff does not know the exact size of the Class at the present time.  However,

Plaintiff believe that due to the nature of the trade and commerce involved, there are thousands

of Class members geographically dispersed throughout the United States such that joinder is

impracticable.  These Class members may be identified from information and records maintained

by Defendants.

103.    Plaintiff's claims are typical of those of the Class and all Class members are

similarly affected by Defendants' wrongful conduct in violation of federal antitrust laws.  All

members of the Class were deprived of the benefits of competitive pricing for the relevant

product and of a competitive market for these products and other products as a result of

Defendants' unlawful conduct.

104.    Plaintiff, as representatives of all Class members, will fairly and adequately

protect the interests of all Class members.  Plaintiff has engaged counsel who is highly

experienced and competent in class action litigation and complex antitrust and consumer

protection litigation.  The interests of Plaintiff are consistent with, and not antagonistic to, those

of the Class.  An effective and practicable manner of notice to Class members of the class action

can be fashioned by the Court.

105.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of Class.  Such common questions of law and fact include:

a.    Whether Defendants conspired with each other and their co-conspirators to raise, fix, maintain or stabilize the price of Blood Plasma Proteins in the United States by restricting output of Blood Plasma Proteins;

b.    Whether Defendants engaged in agreements, contracts, combination, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition in the market for Blood Plasma Proteins;

c.    Whether Defendants' anticompetitive contracts, combinations, and conspiracies have caused Plaintiff and the Class members to suffer antitrust injury in the nature of higher prices for Blood Plasma Proteins;

d.    Whether Defendants' undertook actions to conceal their unlawful conspiracy; and

e.    Whether Defendants' anticompetitive conduct is continuing, thus entitling the Class to injunctive relief to promote unrestrained trade and free and fair competition in the market for Blood Plasma Proteins.

106.    Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

107.    This Class action is superior to any alternatives for the fair and efficient adjudication of this controversy because:

a.    It will avoid a multiplicity of suits and consequent burden on the courts and Defendants; and

b.    It would be virtually impossible for all Class members to intervene as parties-plaintiffs in this action.

108.    Defendants have acted on grounds generally applicable to all Class members in that Defendants' anticompetitive actions foreclosed competition in the markets in which all Class

members purchased the relevant product.  Accordingly, injunctive relief is necessary to protect all Class members from further antitrust injury.

109.    Plaintiff knows of no difficulty that would prevent this case from being maintained as a class action.  Class action treatment is a superior method for the fair and efficient adjudication of this controversy.  Class action treatment will, among other things, allow a large number of similarly situated persons to prosecute their common claims in a single forum, thus avoiding the unnecessary duplication of resources that numerous individual actions would require.  Moreover, class action treatment allows injured persons the ability to seek redress on claims that might be impracticable to pursue individually.

**TOLLING OF STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, EQUITABLE TOLLING AND CONTINUING VIOLATIONS**

110.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

111.    Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until immediately prior to commencing this civil action.

112.    Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

113.    Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiff and the Class assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

114.    Defendants continue to engage in the deceptive practice, and consequently, unwary direct purchasers are injured on a daily basis by Defendants' unlawful conduct.

Therefore, Plaintiff and the Class submit that each instance that Defendants engaged in the conduct complained of herein and each instance that a member of the Class who purchased a product from Defendants constitutes part of a continuing violation and operates to toll the statutes of limitation in this action.

115.    Defendants are estopped from relying on any statute of limitations defense because of its unfair or deceptive conduct.

116.    Defendants' conduct was and is, by its nature, self-concealing.  Still, Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and have actively foreclosed Plaintiff and the Class from learning of their illegal, anti-competitive, unfair and/or deceptive acts.

117.    By reason of the foregoing, the claims of Plaintiff and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

## VIOLATION ALLEGED

### FIRST COUNT
### Violation of 15 U.S.C. § 1 (Agreements in Restraint of Trade)

118.    Plaintiff hereby incorporates each proceeding and succeeding paragraph as though fully set forth herein.

119.    Beginning at least as early as October 1, 2004, and continuing thereafter, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to restrict output and to artificially raise, fix, maintain, or stabilize prices for the

Blood Plasma Proteins in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

120.     Based on the foregoing, and on information and belief, in formulation and effectuating the contract combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to restrict output and to artificially raise, fix, maintain, or stabilize the price of Blood Plasma Proteins sold in the United States. These activities included:

(a) participation in conversations or communications to discuss the supply and price of Blood Plasma Proteins in the United States;

(b) agreeing during those conversations or communications to restrict output and to charge prices at a specified levels and otherwise to increase or maintain prices of Blood Plasma Proteins sold in the United States, and

(c)  agreeing during those conversations or communications to restrict output and to fix or stabilize prices of Blood Plasma Proteins sold in the United States.

121.     Defendants and their co-conspirators engaged in these activities described above for the purpose of effectuating the unlawful agreements described in the Complaint.

122.     Throughout the Class Period, Plaintiff and the other Class members purchased Blood Plasma Proteins from Defendants (or their subsidiaries) or their co-conspirators at supra-competitive prices.

123.     Defendants' unlawful conspiracy has and is having the following effects, among others:

(a) prices charged to Plaintiff and the Class for Blood Plasma Proteins have been fixed, maintained, or stabilized at higher, artificially derived, non-competitive levels;

(b) Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the sale of Blood Plasma Proteins; and

(c) competition in establishing Blood Plasma Proteins prices in the United States has been unlawfully restrained, suppressed and eliminated.

124. Plaintiff and the other Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.

125. Accordingly, Plaintiff and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully prays:

1. That this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and that reasonable notice of this action be given to the all members of the Class.

2. That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

3. That judgment be entered for Plaintiff and Class members against Defendants for trebled damages sustained by Plaintiff and the Class as allowed by law.

4. That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law.

5.      That Plaintiff and the Class recover their costs of the suits, including reasonable attorneys fees, as provided by law.

6.      That Defendants be enjoined from continuing their participation in the alleged conspiracy.

7.      Such other and/or further relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all triable issues.

Dated:  December 28, 2009                Respectfully submitted,


By:___/s/ Marvin A. Miller
Marvin A. Miller
Matthew E. Van Tine
Lori A. Fanning
**MILLER LAW LLC**
115 S. LaSalle Street
Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
Facsimile: (312) 767-2676

Daniel Hume
Kenneth G. Walsh
**KIRBY McINERNEY LLP**
825 Third Avenue, 16th Floor
New York, New York 10022
Telephone: (212) 317-2300
Facsimile: (212) 751-2540

A. Leroy Toliver, Esq.
**TOLIVER & GAINEY, LLP**
942 Green Street, SE Suite A
Conyers, GA 30012
Telephone:(678)374-1034
Facsimile: (770) 785-7879

John Jernigan
**JERNIGAN & McMILLIAN P.C.**
P.O. Box 828
Brewton, AL 36427
Telephone:  (251) 809-2981
Facsimile: (251) 809-2980

*Attorneys for Plaintiff and the Putative Class*